## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM TAYLOR,                    )
                                   )
                    Plaintiff,     )          Civil Action No. 2:20-1450
                                   )
          v.                       )
                                   )
LT. NEPOLEAN, CO-1 FERGUNSON,      )
and SUPERINTENDENT GILMORE,        )
                                   )
                    Defendants.    )

## MEMORANDUM OPINION

Plaintiff William Taylor ("Plaintiff"), an inmate formerly incarcerated at the State Correctional Institution at Greene ("SCI-Greene"), brings this *pro se* action arising out of allegations that prison officials violated his Eighth Amendment rights and Pennsylvania law by spraying him with oleoresin capsicum spray ("OC spray") and not allowing him to change his contaminated clothes or shower for 13 hours.  ECF No. 9.

Presently before the Court is Defendants' Motion for Summary Judgment.  ECF No. 74. For the following reasons, the motion will be granted in part and denied in part.[1]

### I.    Relevant Procedural History

Plaintiff is a state inmate who is currently incarcerated at the State Correctional Institution at Forest ("SCI-Forest").  He began this action on September 28, 2020, by filing a Motion for Leave to Proceed *in forma pauperis* ("IFP Motion"), together with a proposed Complaint.  ECF

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment.  ECF Nos. 10 and 21.

No. 1.  After Plaintiff cured certain deficiencies with his filing, the Court granted Plaintiff's IFP Motion on November 6, 2020, and his Complaint was filed on the same date.  ECF Nos. 4 and 9.

Plaintiff's Complaint concerns events that occurred on December 12 and 13, 2018 while he was housed at SCI-Greene.  ECF No. 9.  He brings claims against three current or former SCI-Greene prison officials: (1) Superintendent Robert Gilmore ("Gilmore");[2] (2) Lieutenant Sam Napoleon ("Napoleon"); and Correctional Officer Joshua Ferguson ("Ferguson").  *Id.* ¶¶ 4-6.  Each Defendant is sued individually and in his official capacity.  *Id.* ¶ 7.

Plaintiff asserts the following claims against all Defendants: (1) Eighth Amendment claim for excessive force (Count I); (2) Eighth Amendment claim for deliberate indifference to a serious medical need (Count II);[3] (3) assault and battery (Count III); and (4) intentional infliction of emotional distress ("IIED") (Count IV).[4]  *Id.* ¶¶ 25-47.

As relief, Plaintiff requests punitive and compensatory damages, injunctive relief in the form of an order requiring the Pennsylvania Department of Corrections ("DOC") to "stop using force on mentally ill inmates," a declaration that his rights have been violated, and his costs for bringing this suit. *Id.* ¶¶ 35-37, 40-41, 43, 47-51.

After the close of discovery, Defendants filed a Motion for Summary Judgment, Brief in Support, and Concise Statement of Material Facts and Appendix.  ECF Nos. 74, 75, 76 and 77.  In response, Plaintiff filed a Brief in Opposition, Declaration and Concise Statement of Material Facts. ECF Nos. 85, 86 and 87.  Defendants' motion has been fully briefed and is ripe for consideration.

---

[2] Gilmore was Superintendent at SCI-Greene during the relevant time.  He has since retired.  See https://www.cor.pa.gov/CorrectionalNewsfront/Pages/Article.aspx?post=1214 (last visited May 24, 2022).

[3] Plaintiff titles this claim as "deliberated [sic] indifference," however, he characterizes his claim as deliberate indifference to a serious medical need in the supporting allegations.  ECF No. 9 ¶ 39.

[4] Plaintiff titles this claim as "emotional destress [sic]."  ECF No. 9 at 11.

## II.     Factual Background

### A.   Use of OC Spray on December 12, 2018

Plaintiff has a history of self-harm.  ECF No. 75 ¶ 1.  Prior to the incident at issue, he had covered the inside of his cell windows "multiple times during self-harm" and refused prison staff's orders to remove the coverings.  *Id.* ¶ 4.

On December 12, 2018, Plaintiff was in cell HA 01 in the diversionary treatment unit ("DTU") when he covered the camera to his cell door.  *Id.* ¶ 5.[5]  He refused to remove the obstruction upon request.  *Id.* ¶ 6.

Napoleon ordered an extraction team, and medical cleared Plaintiff for the possible use of OC spray and restraints.  *Id.* ¶ 7; ECF No. 76-3 at 5.  Plaintiff was notified of the extraction, and he was advised that failure to comply with orders would result in the minimum amount of force used to gain compliance, which could include the use of OC spray.  ECF No. 75 ¶ 12.

Prison officials then transferred Plaintiff to another cell without incident.  *Id.* ¶ 8. During this process, Plaintiff was placed in an intermediate restraint system.  *Id.*  An intermediate restraint system is a form of restraint that involves handcuffing the inmate in front and attaching the handcuffs to a belt that is fastened around his waist, which limits the inmate's ability to use his hands except for activities such as eating and drinking.  *See Gilliam v. Pearce,* No. 3:16-cv-00063, 2017 WL 5015994, at *3 (W.D. Pa. Sept. 26, 2017).

After being transferred, however, Plaintiff cut the belt to his intermediate restraints on the sink in his new cell.  ECF No. 75 ¶ 11; ECF No. 76-4 at 9.  He then showed prison staff what he had done.  ECF No. 75 ¶ 11.  Ferguson administered OC spray into Plaintiff's cell at 18:37 hours.  *Id.* ¶ 13.

---

[5] Based on records provided by Defendants, prison officials also reported that Plaintiff had damaged the bed in his cell.  ECF No. 76-3 at 5.

According to Ferguson, Plaintiff was tearing off the intermediate restraints and refusing to comply with orders when he used OC spray. *Id.* In an employee incident report, Ferguson reported:

> I witnessed I/M Taylor actively attempting to break his intermediate restraint belt using the toothbrush holder in HA 1 cell. I ordered I/M Taylor to stop attempting to break the restraint belt and I/M Taylor refused. At this time I opened the SFA wicket and deployed OC into HA 1 cell to prevent I/M Taylor from breaking out of the restraint belt . . .

ECF No. 76-3 at 29.

Plaintiff admits that he tore his restraint and showed it to Ferguson.[6] ECF No. 87 at 5. However, he claims that he was not actively cutting the restraint when he was sprayed, and that he remained secured in handcuffs. ECF No. 86 at 2. According to Plaintiff, he was standing at the door of his cell when Ferguson told him "I'm going to F'ing spray you now." ECF No. 76-1 at 7. After Plaintiff shrugged his shoulders, Ferguson deployed a "whole can" of OC spray into Plaintiff's cell. *Id.*[7]

Although Napoleon oversaw the extraction team and responded after Ferguson administered OC spray, there is no evidence in the record that he was present just before, or during, Ferguson's use of OC spray. *See, e.g.,* ECF No. 76-3 at 2, 5, 11 and 19; Defendants' App'x, at Exhibits D and F (video footage).

---

[6] In his deposition testimony on July 21, 2021, Plaintiff initially appeared to dispute that he cut his restraint belt on the sink, saying that he only admitted to doing so because he was "being sarcastic." ECF No. 76-1 at 9. However, in his subsequent deposition testimony on August 30, 2021, he testified that he "cut [the belt] open with the sink," and in his response to Defendants' Statement of Undisputed Material Facts, he does not dispute the fact that he did so. ECF No. 76-4 at 9; ECF No. 86.

[7] Defendants proffered video footage of the following: (1) Plaintiff's cell extraction on December 12, 2018; (2) Plaintiff's cell extraction and immediate aftermath of Plaintiff's exposure to OC spray on December 12, 2018, including Plaintiffs visit to the medical unit; and (3) Plaintiff's release from his cell and restraint removal on December 13, 2018. *See* Defendants' App'x, at Exhibits D, F and G. The record does not include any video of Ferguson administering the OC spray, however, or the events that immediately preceded it.

B. **Post-Incident Treatment**

After Ferguson administered the OC spray, Plaintiff was taken to the medical unit for treatment. ECF No. 75 ¶ 14. While in the medical unit, Plaintiff stated: "ain't nobody harmed me, they did what they supposed to." *Id.* ¶ 16. He received treatment for the OC spray on his face and his eyes were wiped. ECF No. 75 ¶ 17; ECF No. 76-1 at 8-9. Plaintiff did not receive, or request, a change of clothes or shower while in the medical unit. ECF No. 75 ¶ 18; Defendants' App'x, at Exhibit F (video footage).

Under DOC policy, the follow-up procedures for prison officials' use of chemical agents are as follows:

> After resistance has ceased and control has been established, every reasonable effort to allow the individual relief from any discomfort associated with chemical dispersing shall be made by:
>
> a. providing exposure to a clean air environment;
> b. flushing eyes and all affected skin areas with cold, clear water;
> c. exchanging contaminated clothing for clean clothing; and
> d. ensuring that each individual identified as being exposed to a chemical dispersing receives an examination by the Medical Department. The examination must be documented on the DC-457, Medical Incident/Injury Report.

ECF No. 87-3 at 1.

While prison officials replaced Plaintiff's torn restraints and moved him to a neighboring cell, he did not receive a change for his contaminated clothes or a shower until the next morning. ECF No. 75 ¶¶ 21-24. As a result, he claims that he suffered burning pain throughout the night and could not sleep. ECF No. 9 ¶¶ 39, 46. Plaintiff never specifically asked Defendants to provide a change of clothes. ECF No. 75 ¶ 19.

### C.  **Plaintiff's Grievance Regarding the December 12, 2018 Incident**

#### 1.  Initial grievance and response

On December 18, 2018, Plaintiff filed Grievance No. 777850 regarding Ferguson's use of OC spray and failure to receive a change for his contaminated clothing on December 12, 2018. ECF No. 76-5 at 43-44.

On December 21, 2018, the Facility Grievance Coordinator Tracy Shawley ("Shawley"), issued a Notice of Investigation notifying Plaintiff that an extension of time was necessary to appropriately investigate and respond to his grievance under DC-ADM 001. *Id.* at 45.

On March 31, 2019, Plaintiff submitted an inmate request to staff asking about the status of his grievance. Plaintiff said that if any answer was provided, he needed a copy. A staff member responded: "I emailed Ms. Shawley this date. I will let you know when I receive a response." *Id.* at 54.

On May 2, 2019, Plaintiff submitted another inmate request to staff form, again inquiring about the status of his grievance. He noted that it had been four months. A staff member responded on May 6, 2019: "[d]elivered to you on this date." *Id.* at 55.

In a response dated May 1, 2019, Shawley denied Plaintiff's grievance as follows:

I am in receipt of your grievance and have been assigned to investigate your concern(s). In your grievance . . . you state you were removed from HA-10 [sic] cell and was taken to the H block strip cage. You were then seen by a nurse and put/placed in HA-01 behind a S.F.A. but was never given a reason why. CO1 opened the S.F.A. on HA-01 and sprayed you with a big can of OC while you was in a belt and cuff restraint. After you were taken to see medical you were never given clean close (sic) to put on. You want pain and suffering and nominal damages.

I have reviewed your concerns and find this matter was investigated and reviewed by a higher authority. That authority (BII) concurred with the findings of the investigation conducted by the security department.

Your grievance and requested relief are hereby denied.

6

*Id.* at 46.

    2.  <u>Plaintiff's appeal to the facility superintendent</u>

Plaintiff appealed the denial of his initial grievance to Gilmore, the Facility Superintendent. ECF No. 76-5 at 47.  Plaintiff dated his appeal May 9, 2019.  <u>Id.</u>  However, it is unclear when Gilmore received this appeal.  As shown below, while the appeal form includes a designated area for the grievance coordinator to sign and date upon receipt, that portion of the form was not completed in this case.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____      _____
Signature of Facility Grievance Coordinator                             Date
WHITE Facility Grievance Coordinator Copy      CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

*Id.*

On June 27, 2019, Plaintiff submitted an inmate request to staff form, inquiring about the status of his appeal to Gilmore.  *Id.* at 56.  In his request, Plaintiff stated that he mailed his appeal during the week of May 9, 2019, but he never received a response.  A staff member responded: "I emailed Ms. Shawley.  I will send you a copy once I receive it from her."  *Id.*

Ultimately, Gilmore upheld the denial, noting that the matter had been investigated and reviewed by the SCI-Greene security department and BII.  ECF No. 76-5 at 48.  There is some discrepancy in the record, however, as to when Plaintiff received Gilmore's response.

Defendants contend that Gilmore responded on June 4, 2019, referring the Court to a copy of Gilmore's response.  ECF No. 77 at 8.[8]  Gilmore's response appears to have originally been dated June 4, 2019 at two locations.  But one of those two dates was crossed out and replaced with the handwritten date of July 1, 2019, as shown below.



ECF No. 76-5 at 48 (top of page, with amended date in upper left-hand corner).

\*\*\*

Id. (bottom of page).

Defendants do not address this discrepancy. Plaintiff contends that he did not receive Gilmore's response until July 1, 2019, which matches the amended date in the upper left-hand corner of Gilmore's response.  ECF No. 86 at 3.

---

[8] In particular, Defendants rely on an affidavit from Keri Moore ("Moore"), Assistant Chief Grievance Officer, who in turn cites Gilmore's response as the source of the June 4, 2019 response date.  ECF No. 76-5 at 4 ¶ 18 (citing ECF No. 76-5 at 48).

### 3.  Plaintiff's appeal to final review

On July 2, 2019, Plaintiff drafted an appeal to the DOC's Bureau of Investigations and Intelligence ("BII").  ECF No. 76-5 at 4, 49.  In his appeal, Plaintiff noted that he received Gilmore's response on July 1, 2019.  *Id.* at 49.

On August 19, 2019, Plaintiff placed a request to staff member about his appeal.  *Id.* at 51. On August 26, 2019, Plaintiff was advised in response that it appeared he had sent his appeal to BII instead of the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  *Id.*

Plaintiff's appeal was resubmitted to SOIGA, which received it on September 12, 2019. *Id.* at 4.  On September 23, 2019, the Chief Grievance Officer denied Plaintiff's appeal because it was not timely submitted within fifteen working days under DOC policy DC-ADM 804:

> Your appeal to final review was submitted untimely (due by 6/25/19; postmarked 9/4/19).  Therefore, your grievance is dismissed.  You are encouraged to review the DC ADM 804 in its entirety to familiarize yourself with the proper submission procedures.

*Id.* at 42.

## III.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment.  *Id.* at 323. This showing does not necessarily require the moving party to disprove the opponent's claims. Instead, this burden may often be discharged simply by pointing out for the court an absence of

evidence in support of the non-moving party's claims. *Id.; see, e.g., Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015).

Once the moving party has met its initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. Cnty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold pro se pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a pro se plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g., Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the pro se plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories ... sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820

(3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law.").

## IV.   Discussion

### A.   Failure to Exhaust Administrative Remedies

In support of their Motion for Summary Judgment, Defendants argue that Plaintiff failed to exhaust his administrative remedies.  Under DC-ADM 804, they argue, Plaintiff was required to submit a final appeal to SOIGA within 15 working days from the date of the facility manager's decision.  Defendants contend that Gilmore denied Plaintiff's appeal on June 4, 2019, so Plaintiff needed to appeal to SOIGA by June 25, 2019.  Because he failed to do so, they argue, he did not properly exhaust his administrative remedies.  ECF No. 77 at 5-8.

In response, Plaintiff argues that administrative remedies were unavailable to him because Gilmore did not issue a timely response to his appeal under DC-ADM 804.  ECF No. 87 at 2.  Plaintiff contends that Gilmore should have received his appeal by May 15, 2019, at the latest, but he did not respond until more than 15 working days later, on July 1, 2019.  *Id.*; ECF No. 86 at 3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that a prisoner exhaust available administrative remedies before filing an action challenging prison conditions or experiences.  Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner, confined in any jail, prison or correctional facility until such administrative remedies as are available are exhausted."  *Id.*

As the United States Court of Appeals for the Third Circuit has explained:

> The PLRA requires inmates to exhaust prison grievance procedures before suing in court.  42 U.S.C. § 1997e(a).  "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself."  *Jones*, 549 U.S. at 218, 127 S. Ct. 910 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S. Ct. 2378, 165 L.Ed.2d 368 (2006)).

*Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016).

DC-ADM 804 provides a three-step process, and an inmate must follow each of the steps in order to exhaust his administrative remedies under the PLRA. *See Jackson v. Carter*, 813 F. App'x 820, 823 (3d Cir. 2020) ("The DOC has a grievance policy involving a three-step process that an inmate must fully complete in order to properly exhaust his administrative remedies under the PLRA."). The three steps are: (1) initial review by a grievance officer of an inmate grievance; (2) appeal to the facility manager; and (3) final appeal to SOIGA, as follows:

> First, within fifteen [working] days of the incident, the prisoner is required to submit a written grievance for review by the facility manager or the regional grievance coordinator, who, in turn, must respond in writing within fifteen business days. Second, if the grievance is denied, the inmate must submit a written appeal to the Facility Manager within fifteen working days, and again the inmate is to receive a written response within fifteen working days. Finally, if the inmate remains dissatisfied following this second level outcome, he must submit an appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within fifteen working days, and then the inmate will receive a final determination in writing within thirty days. *Downey v. Pa. Dep't of Corrs.,* 968 F.3d 299, 305-06 (3d Cir. 2020). An inmate has not properly exhausted the grievance until SOIGA issues its final determination.

*Jackson v. O'Brien*, No. 1:18-cv-00032, 2021 WL 5087922, at *3 (W.D. Pa. Nov. 2, 2021) (internal footnote omitted).

While exhaustion of administrative remedies is mandatory under the PLRA, "[a] prisoner need not exhaust administrative remedies prior to filing a claim if the remedies are not 'available'" to the inmate. *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such remedies as are 'available.'" *Id.* at 1862 (quoting § 1997e(a)). In other words, "the exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 1858. "[T]he ordinary meaning of the

word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

As the Third Circuit has held, one situation in which remedies are considered "unavailable" is if prison officials fail to comply with their own grievance policy:

> The PLRA requires that prisoners comply with the procedural demands of a system created by their jailors.  No less must prisons comply with the procedural demands of the system they created.  Hence we hold that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement.

*Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019).

"The burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).  "But once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." *Id.* (citing *Tuckel v. Grover*, 660 F.3d 1249, 1253-54 (10th Cir. 2011)).

Upon review, there are material questions of fact about whether administrative remedies were available to Plaintiff.  Under DC-ADM 804, Gilmore was required to respond within 15 working days of receiving Plaintiff's appeal.  Plaintiff submitted his appeal to Gilmore on May 9, 2019.  While the parties dispute when Gilmore issued his response, there is ample evidence to suggest that Gilmore did not respond until significantly more than 15 working days later—on July

13

1, 2019.  As a result, Plaintiff could plausibly prove that Gilmore did not timely respond, rendering administrative remedies unavailable to him.  *See Shifflett*, 934 F.3d at 365.[9]

"When the grievance process is unavailable, the prisoner is deemed to have exhausted his administrative remedies for purposes of the PLRA." *Jackson*, 2021 W 5087922, at \*7 (citing *Ross*, 136 S. Ct. at 1856-60).  Thus, while Defendants argue that Plaintiff defaulted by failing to submit a timely final appeal to SOIGA, there is a question of material fact as to whether Plaintiff had already fully exhausted his administrative remedies before he reached the final appeal stage.  For these reasons, the Motion for Summary Judgment will be denied as to to the issue of exhaustion.

### B.  Eighth Amendment Excessive Force Claim (Count I)

Defendants also argue that the evidence does not support Plaintiff's Eighth Amendment excessive force claim in Count I.  For the reasons below, the Court will grant Defendants' motion for summary judgment as to Count I against Napoleon and Gilmore, only.

#### 1.  Ferguson

In support of their motion, Defendants argue that Ferguson's use of OC spray was appropriate because Plaintiff was tearing off his restraints, there was a need to gain compliance, and Plaintiff suffered no harm.  ECF No. 77 at 9- 10.  As a result, Defendants argue that Plaintiff cannot establish an Eighth Amendment claim based on the use of excessive force.

In response, Plaintiff argues that force was not required because he was simply showing Ferguson his previously torn restraint, and he was not actively engaged in any misconduct when Ferguson sprayed him.  ECF No. 87 at 5-8.  He argues that he was, in fact, harmed, referring the

---

[9] The Court also notes that it is unclear whether prison officials timely responded to Plaintiff's initial grievance. Plaintiff was notified that prison officials required an extension of time to conduct an investigation pursuant to DOC policy DC-ADM 001. The record does not reflect when this investigated was completed.

Court to his allegations that he was in pain throughout the night as a result of not receiving a change of clothes or shower.  *Id.*

The Eighth Amendment's protection against cruel and unusual punishment is the "primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *Brooks v. Kyler*, 204 F.3d 102, 105 (3d Cir. 2000).  In determining whether excessive force was used, the pivotal inquiry is whether "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (citing *Brooks*, 294 F.3d at 106, quoting *Hudson v. McMillian*, 503 U.S.1 (1992)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Several factors guide this analysis, including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted: (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Smith*, 293 F.3d at 649 (citations omitted).

Under some circumstances, a court may determine whether excessive force was used as a matter of law.  *Easley v. Tritt*, No. 1:17-cv-930, 2021 WL 978815, at *14 (M.D. Pa. Mar. 16, 2021).  Summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." *Id.* (quoting *Brooks*, 204 F.3d at 106).

Upon review, the Court finds that summary judgment in favor of Ferguson must be denied on this basis.  Viewing the evidence in the light most favorable to Plaintiff, the record reflects that Plaintiff was secured in handcuffs in his cell when Ferguson administered OC spray.  The Court also notes Plaintiff's testimony that he was standing at his cell door, voluntarily revealed a partial

tear in his restraint belt, and he was no longer trying to tear it when Ferguson announced that he would spray Plaintiff before deploying a "whole can" of OC spray into his cell.  Plaintiff allegedly suffered a burning pain in his eyes, face, and skin, and he continued to feel the burning effects of the OC spray until he could shower and change 13 hours later.

Based on this evidence, a jury could reasonably find that Ferguson did not act in a good-faith effort to maintain or restore discipline when he administered the OC spray.  While Plaintiff partially tore his fabric restraint belt, he remained subject to other restraints (metal handcuffs and a prison cell), and he was allegedly compliant at the time of the incident.   Under these circumstances, a jury could find that the need for force, if any, was minimal, that Plaintiff did not present any significant threat to safety, that Ferguson's alleged use of a "whole can" of OC spray was not reasonably related to the minimal, if any, force required, and that no efforts were made to defuse the situation before force was employed.

Thus, because genuine issues of material fact exist, Defendants' motion for summary judgment will be denied with respect to the claim against Ferguson in Count I.

### 2.  Napoleon and Gilmore

As for Defendants Napoleon and Gilmore, Defendants argue that summary judgment should be granted in their favor with respect to Count I because they were not personally involved in any underlying wrong.

Plaintiff argues that Napoleon was the commanding officer responsible for giving orders during the relevant time, and that he gave the order not to fully decontaminate Plaintiff.  ECF No. 87 at 8-9.  He does not specifically address Defendants' argument about Gilmore.

Upon review, the Court concludes that summary judgment should be granted in favor of Gilmore and Napoleon with respect to Count I based on their lack of personal involvement.

Plaintiff brings his Eighth Amendment claims under 42 U.S.C. § 1983.  To establish individual liability under § 1983, "[a] defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."  *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Rizzo v. Goode*, 423 U.S. 362 (1976).

There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2017), *rev'd on other grounds*, *Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be held liable if he "participated in violating the plaintiff's rights, directed others to violated them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.,* 629 F.3d 121, 129 & n. 5 (3d Cir. 2010) (citing *A.M. ex rel. J.M.K. Luzerne Cnty.*, 372 F.3d 572, 586 (3d Cir. 2004)).  Second, a supervisor may be liable if he "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M.,* 372 F.3d at 586.

Gilmore was the Superintendent of SCI-Greene during the relevant time and denied Plaintiff's grievance appeal.  There is no evidence, however, that he was personally involved in the events of December 12, 2018.  Gilmore cannot be held liable in his capacity as a supervisor because there is no evidence that he participated in violating Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations, or that he maintained any policy, practice or custom that caused Plaintiff's harm.  While Gilmore was involved after-the-fact in the grievance process, this is insufficient to establish his personal involvement.  *See Rogers v. United States*, 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance

after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official.")).

As for Napoleon, the Court also finds that he lacks the requisite personal involvement. Napoleon did not personally use force on Plaintiff, and he was not present when Ferguson administered the OC spray. While Napoleon was involved with Plaintiff's cell extraction and responded after Ferguson's use of force, there is no evidence he knew about Ferguson's actions or that he maintained any policy or practice that gave rise to the alleged excessive use of force in this case.

Thus, for these reasons, the Court will grant the motion for summary judgment in favor of Napoleon and Ferguson as to Count I.

### C.  Eighth Amendment Deliberate Indifference Claim (Count II)

Plaintiff also brings an Eighth Amendment claim for deliberate indifference to a serious medical need in Count II. In support of the Motion for Summary Judgment, Defendants argue that Plaintiff's claim fails because any harm was *de minimis,* the discomfort caused by not receiving a change of clothes for a matter of hours is not actionable under the Eighth Amendment, and that he never asked Defendants or medical for change of clothes. ECF No. 77 at 11.

In response, Plaintiff points to authority that a failure to decontaminate prisoners exposed to OC spray can support a claim under the Eighth Amendment. ECF No. 87 at 6 (citing *Bomar v. Wetzel,* No. 17-1035, 2020 WL 907641, at *5 (W.D. Pa. Feb. 3, 2020), *report & recommendation adopted* 2020 WL 906720 (W.D. Pa. Feb. 25, 2020)). He argues that prison officials know the effects of OC spray, that it is common practice to decontaminate prisoners after using it, and that he was in pain for 13 hours. *Id.* at 7.

"To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).  Courts have held that the failure to decontaminate or provide medical treatment for prisoners exposed to OC spray can violate the Eighth Amendment where the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Bomar,* 2020 WL 907641, at *5-6 (quoting *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002)).

Non-medical defendants, like the defendants in this case, cannot be found deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).  "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).  "[A]bsent reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirements of deliberate indifference." *Id*. at 236.

Upon review, the record does not support a finding that Defendants were deliberately indifferent.  After he was exposed to the OC spray, Plaintiff immediately was taken to the medical unit for treatment.  Plaintiff did not tell Defendants that he was suffering continued discomfort from his contaminated clothes, and they had no reason to know that he was not being appropriately treated.  To the extent that Plaintiff argues that Napoleon gave the order not to decontaminate him, he does not proffer evidence to support this finding.  Therefore, the motion for summary judgment will be granted with respect to Count II.

### D. Qualified Immunity

In support of the Motion for Summary Judgment, Defendants argue in the alternative that they have qualified immunity relative to Plaintiff's Eighth Amendment claims. *Id.* at 13-14. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is a two-step inquiry into whether qualified immunity applies: (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223 (2009).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is intended to shield officers who make "reasonable but mistaken judgments about open legal questions" and it protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743. The ultimate question is whether the state of the law when the offense occurred gave Defendants "fair warning" that their acts were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As discussed, Plaintiff's sole remaining Eighth Amendment claim is his excessive force claim against Ferguson in his personal capacity. With respect to this claim, Defendants argue that Ferguson is entitled to qualified immunity because there "no robust consensus of case law that would demonstrate to Defendants that an inmate's constitutional rights would be violated by the use of OC spray which was necessary to restore order and secure the inmate when an inmate admittedly was cutting his restraints." ECF No. 77 at 14. For the reasons discussed, however,

there are questions of fact relative to whether Plaintiff was still cutting his restraints when force was used, and whether the level of force used was, in fact, "necessary to restore order."  Because the evidence supports a plausible claim under well-established precedent, the Court will deny Defendants motion for summary judgment that is based on qualified immunity.

### E.  Claims against Defendants in their Official Capacities

Defendants also argue that summary judgment should be granted as to any claims against them in their official capacities because are entitled to Eleventh Amendment immunity.  ECF No. 77 at 18-19.  The Court agrees.

Relevant here, "a suit against a state official in his or her official capacity is not a suit against the official bur rather it is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).   In this case, Defendants were employees of the DOC.  Therefore, a suit against Defendants in their official capacities is, in reality, a suit against the DOC, and it is no different from a suit against the Commonwealth of Pennsylvania.

The Eleventh Amendment provides states with immunity not only from suits brought by citizens of other states, but also from suits brought by their own citizens.  *Hans v. Louisiana*, 134 U.S. 1, 12-14 (1890).  However, a state's Eleventh Amendment protection from federal suits is not absolute.   Congress may authorize such a suit under its power to enforce the Fourteenth Amendment, *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999), thereby abrogating a state's sovereign immunity, but only "when it both unequivocally intends to do so and 'acts pursuant to a valid grant of constitutional authority,'" *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001) (quoting *Kimel v. Bd. of Regents*, 528 U.S. 62, 73 (2000)).   A state may also waive its sovereign immunity by consenting to suit.

*Coll. Sav. Bank*, 527 U.S. at 670 (citing *Clark v. Barnard*, 108 U.S. 436 (1883)).  Additionally, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of *Ex parte Young*, 209 U.S. 123, 159-60 (1908), despite the text of the Eleventh Amendment.  *Alden v. Maine*, 527 U.S. 706, 757 (1999).

By statute, the Commonwealth of Pennsylvania has specifically withheld its consent to be sued.  42 Pa. C.S.A. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *see also Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981).  Additionally, Congress has not expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages.  *See, e.g., Will,* 491 U.S. at 66 ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); *Quern v. Jordan*, 440 U.S. 332, 341 (1979); *Boykin v. Bloomsburg Univ. of Pa.*, 893 F. Supp. 378 (M.D. Pa. 1995) (holding that States' immunity has not been abrogated for actions brought under §§ 1981, 1983, 1985, and 1986), *aff'd*, 91 F.3d 122 (3d Cir. 1996)).

For these reasons, Plaintiff is barred from seeking money damages against Defendants in their official capacities.  Because he does not plead any claim for prospective relief arising out of any ongoing violation of federal law, he also does not assert any viable claim for prospective relief against Defendants in their official capacities.  As such, the Court will grant the motion for summary judgment relative to Plaintiff's claims against Defendants in their official capacities.

### F.  Tort claims (Counts III and IV)

Finally, Defendants move for summary judgment as to Plaintiff's tort claims under Pennsylvania law in Counts III (assault and battery) and IV (IIED).  For the reasons below, the

Court grants the motion for summary judgment relative to Plaintiff's assault and battery claims against Napoleon and Gilmore, as well as his IIED claim against all Defendants.

### 1.  Assault and Battery (Count III)

In support of the Motion for Summary Judgment, Defendants argue that Plaintiff's assault and battery claims fail because they are premised on the claim that Plaintiff did not damage his restraint belt and therefore should not have been sprayed with OC spray.  ECF No. 77 at 11-12. Because Plaintiff admitted to cutting the restraint belt and Ferguson's use of OC spray was justified, they argue, the Court should enter summary judgment as to Count III.  *Id.*

Plaintiff only specifically responds relative to his tort claims against Ferguson.  *See* ECF No. 87 at 8.  He argues that he was not cutting the belt at the time he was sprayed, and therefore the use of force was not justified.  *Id.* at 5-8.

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done*."  Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quoting *Cohen v. Lit Bros.,* 70 A.2d 419, 421 (1950)).

As discussed, Plaintiff does not contest the entry of summary judgment for Napoleon or Gilmore.  Moreover, Napoleon and Gilmore were not involved in administering the OC spray, or in threatening to do so.   For these reasons, the motion for summary judgment will be granted as to Count III against Napoleon and Gilmore.

With respect to Ferguson, however, the Court finds that summary judgment should be denied relative to Plaintiff's assault and battery claims.  As discussed, the necessity of force threatened and used by Ferguson is genuinely in dispute.  Because there is sufficient evidence for

a trier of fact to conclude that the force applied by Ferguson was excessive, Defendants' motion

for summary judgment will be denied with respect to the claim in Count III against Ferguson.

### 2.   Intentional Infliction of Emotional Distress (Count IV)

Defendants also seek summary judgment as to Plaintiff's IIED claim.   In support,

Defendants argue that any underlying conduct is not "extreme and outrageous" because it was a

justified use of force.   Because Plaintiff admitted there was no harm, they argue, he did not suffer

any distress.   ECF No. 77 at 12.

As discussed, Plaintiff does not specifically address his tort claims against Napoleon or

Gilmore in his Response.   Plaintiff argues that while Defendants refer to video evidence in which

Plaintiff states he was not harmed, this ignores the fact that he is alleging continued harm

throughout the night because of his contaminated clothing.   ECF No. 87 at 6-7.

To establish an IIED claim, Plaintiff must show "(1) the defendant's conduct was extreme

and outrageous; (2) the defendant's conduct caused the plaintiff severe emotional distress; and that

(3) the defendant acted intending to cause that person such distress or with knowledge that such

distress was substantially certain to occur." *Ghrist v. CBS Broad, Inc.*, 40 F. Supp. 3d 623, 630

(W.D. Pa. 2014) (citing *Brown v. Muhlenberg Twp.,* 269 F.3d 205, 217 (3d Cir. 2001)).   Liability

is only imposed "where the conduct has been so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community*." Reedy v. Evanson*, 615 F.3d 197, 231-32 (3d Cir. 2010)

(quoting *Field v. Phila. Elec. Co.,* 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989)).

"To the extent state and federal courts in Pennsylvania recognize a claim for intentional

infliction of emotional distress, they consistently require that a plaintiff suffer some physical

manifestation of his alleged emotional distress." *Buttermore v. Loans*, No. 15-1514, 2016 WL

308875, at *7 (W.D. Pa. Jan. 25, 2016) (collecting cases).  Pennsylvania courts also require a plaintiff to support any alleged physical manifestation of emotional distress with competent medical evidence." *Id.* (citing *Lawson v. Pa. SPCA*, No. 13-7403, 2015 WL 4976523, at *9 (E.D. Pa. Aug. 20, 2015); *Wilson v. Am. Gen. Fin. Inc.,* 807 F. Supp. 2d 291, 303 (W.D. Pa. 2011) (citing Pennsylvania decisions)).

Upon review, the Court finds that summary judgment should be granted relative to Plaintiff's IIED claim.  Plaintiff does not proffer sufficient evidence of harm to support this claim. There is no evidence that he suffered severe emotional distress, let alone competent medical evidence that such distress caused physical symptoms.  As discussed, Plaintiff also does not contest the entry of summary judgment relative to Gilmore and Napoleon.  For these reasons below, the Court will grant the motion for summary judgment in favor of all Defendants with respect to Plaintiff's IIED claim in Count IV.

## V.   Conclusion

For the foregoing reasons, the Motion for Summary Judgment, ECF No. 75, will be granted in part and denied in part.  The Motion for Summary Judgment will be granted with respect to:

1. The Eighth Amendment excessive force claim (Count I) against Defendants Napoleon and Gilmore;

2. The Eighth Amendment deliberate indifference claim (Count II) against all Defendants;

3. The claims against all Defendants in their official capacities;

4. The assault and battery claim (Count III) against Defendants Napoleon and Gilmore; and

5. The intentional infliction of emotional distress claim (Count IV) against all Defendants.

The Motion for Summary Judgment is denied in all other respect.  An appropriate Order will follow.

Dated: May 27, 2022                          BY THE COURT:

                                             s/ Patricia L Dodge
                                             PATRICIA L. DODGE
                                             UNITED STATES MAGISTRATE JUDGE


cc:      William Taylor
         HN-2880
         SCI Forest
         P.O. Box 945
         286 Woodland Drive
         Marienville, PA 16239